No. 97-592

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 22

STATE OF MONTANA,

Plaintiff and Respondent,

v.

RONALD C. WOOSTER,

Defendant and Appellant.

FILED

FEB 18 1999

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Second Judicial District,
                In and for the County of Silver Bow,
                The Honorable James E. Purcell, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                Brad L. Belke, (argued) Attorney at Law, Butte, Montana

        For Respondent:

                Hon. Joseph P. Mazurek, Attorney General

                Robert M. McCarthy, Silver Bow County Attorney,
                Brad Newman, (argued) Chief Deputy County Attorney, Butte, Montana

                                Argued:    April 30, 1998
                                Submitted: June 23, 1998
                                Decided:   February 18, 1999

Filed:

_____
                Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1    Ronald C. Wooster (Wooster) appeals from the decision of the Second Judicial District Court, Silver Bow County, concluding that Wooster continues to suffer from a mental disease or defect that causes him to be a danger to society and prevents his release from Montana State Hospital. We remand for further proceedings consistent with this opinion.

## Standard of Review

¶2    We review a district court's findings of fact to determine whether they are clearly erroneous. Interstate Production Credit v. DeSaye (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287.

## Factual and Procedural Background

¶3    During an investigation of an apparent accident on U.S. Highway 10 near Butte, Montana, highway patrol officers discovered two dead passengers in a truck that Wooster had driven. The passengers were Wooster's two daughters, two-and-a-half-year-old Stacy and six-year-old Kelly. Both girls had died because of fatal neck wounds that were inflicted with an axe. Wooster later confessed to the murders and he was charged with two counts of deliberate homicide.

¶4    The District Court committed Wooster to Warm Springs State Hospital (hereafter, Montana State Hospital) for a psychiatric examination to determine whether Wooster was competent to stand trial. In a report submitted in April, 1978, Katherine Gallagher (Dr.

Gallagher), a psychologist with Montana State Hospital, diagnosed Wooster with "Schizophrenia, Chronic Undifferentiated Type," and determined that he was incompetent to stand trial. Dr. Gallagher reported that Wooster told her that he had not drunk alcohol or used drugs on the day that his daughters died. Dr. Gallagher also reported that when his daughters died, Wooster "was thinking about saving mankind as he was heaven-sent and that was his purpose. . . . Now, he does not want to die or be crucified, although he is still God."

¶5    In late October, 1978 the District Court held a hearing to determine whether Wooster had mental capacity to understand the proceedings and "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law at the time of the commission of the offense charged." In an order entered in November, 1978 the District Court concluded that Wooster was incompetent as a result of a mental disease or defect and that he "suffered from a mental disease or defect at the time of the commission of the offense for which he is charged which rendered him incapable of appreciating the criminality of his conduct or conforming his conduct to the requirements of the law." The District Court acquitted Wooster of the two charges of deliberate homicide, and committed him to the custody of the Superintendent of Montana State Hospital for "custody, care, and treatment." The District Court set a hearing in December, 1978, pursuant to § 95-508, RCM (1947), to determine Wooster's mental condition and to determine whether Wooster could then be safely discharged without danger to others. Following the December, 1978 hearing the District Court found that Wooster continued to suffer from a mental disease or defect that made him

3

a danger to himself and others if discharged or released from the hospital. The District Court remanded Wooster to the permanent custody of Montana State Hospital but recognized his statutory right to future hearings "regarding his mental condition."

¶6     In May, 1990, Wooster petitioned the District Court for release from Montana State Hospital. The State of Montana (the State) opposed Wooster's petition and moved for a psychiatric examination of Wooster pursuant to §§ 46-14-302 and -303, MCA (1989). In response, the District Court appointed Dr. William Stratford (Dr. Stratford), a psychiatrist, to evaluate the mental condition of Wooster. The District Court ordered that Dr. Stratford retain a clinical psychologist to assist him in that examination.

¶7     Dr. Stratford engaged Michael J. Scolatti, Ph.D. (Dr. Scolatti), a clinical psychologist. Dr. Scolatti found that Wooster had originally been diagnosed with Schizophrenia, Chronic Undifferentiated Type and that he had been diagnosed with that condition during his first three years of confinement. However, in Wooster's most recent psychological evaluation, Wooster was diagnosed with antisocial personality disorder, alcohol dependency that was in remission, and "psychoactive substance abuse not otherwise specified." Dr. Scolatti also tested Wooster and reported that his test results "are indicative of a long-term ingrained personality disorder, primarily that of an Antisocial Personality Disorder." Wooster disclosed to Dr. Scolatti that when he was 18 years old, he became drunk and smoked "dope" while baby sitting and that he exposed himself to a child. Wooster blamed that conduct on his use of drugs and alcohol and said it was an "isolated" incident. Dr. Scolatti observed that

4

when asked about the murder of his two daughters, "Mr. Wooster gave a lengthy, detailed, and apparently rehearsed tale with Satanic overtures and UFOs. However, when it came to describing the actual homicides, Mr. Wooster experienced a complete blackout. Then after completing the murders Mr. Wooster's memory returned." Dr. Scolatti concluded that "[i]t is unusual to have such a circumscribed memory loss if caused by alcohol consumption or psychosis." Dr. Scolatti found that Wooster had "minimal" remorse and no insight into his crimes and that Wooster had not received enough treatment for Dr. Scolatti to conclude that Wooster was no longer a danger to society. Dr. Scolatti recommended that Wooster receive anger management therapy and treatment for his chemical dependency and urged that "all precautions and therapeutic avenues should be exhaustively utilized before he is released."

¶8 When Dr. Stratford evaluated Wooster in 1990, Wooster had not received any medication in six or seven years. Dr. Stratford noted that in 1970, Wooster was voluntarily committed to Warm Springs State Hospital and that his files showed that he had exposed himself to a child. In March, 1990, Wooster had been diagnosed as a Chronic Undifferentiated Schizophrenic and as having an antisocial personality disorder. Dr. Stratford concluded that Wooster had not received any treatment that would address his antisocial capacity or his psychosis, if indeed his psychosis existed, nor had Wooster received treatment for drug and alcohol abuse and his "sexual dysfunction." Dr. Stratford also found that Wooster suffered from a personality disorder, "primarily antisocial type." Dr.

5

Stratford concluded that Wooster "poses a substantial threat or risk to others if released, and should not be released."

¶9     In March, 1991 the District Court determined that Wooster continued to suffer from a mental disorder, "specifically an Antisocial Personality Disorder," and an "alcohol and chemical dependency." Further, the District Court concluded that treatment or therapy to address Wooster's various issues was necessary before he could be safely released. The District Court denied Wooster's petition for release, concluding that "the record is clear that if released, the defendant will NOT BE ADEQUATELY SUPERVISED OR MONITORED."

¶10    Wooster filed a *pro se* petition for release in November, 1994 pursuant to § 46-14-303, MCA (1993). His petition was supported by a report from Ardean Moore, M.D. (Dr. Moore) of the Montana State Hospital staff. Dr. Moore found that Wooster was not psychotic and that he did not have a serious mental illness. She recommended that serious consideration be given his discharge from Montana State Hospital. The District Court appointed counsel to represent Wooster and appointed Dr. Stratford to conduct an independent examination of Wooster's mental condition.

¶11    Dr. Stratford filed his report with the District Court in January, 1995. Dr. Stratford found that Wooster still had not been treated for the sexual incident that involved a child. Dr. Stratford reported that Wooster told a group that he was "100% sure that the experiences would reoccur if I return to drugs or alcohol," and that if he drank again he would "kill

himself." Dr. Stratford concluded that Wooster was doing well because of the hospital's structure, which he described as "akin to a policeman at the elbow." Dr. Stratford determined that Wooster's original psychotic symptoms had disappeared but that they "certainly" could reoccur. Dr. Stratford concluded that Wooster was likely to abuse alcohol and other substances, that he was still an untreated sex offender, and that his "personality style with his subsequent impulsivity or hostility" was a concern. Dr. Stratford urged that Wooster not be released.

¶12 At Wooster's request, the District Court appoint Susan Sachsenmaier, Ph.D. (Dr. Sachsenmaier) to evaluate him. In her report, Dr. Sachsenmaier expressed concern over Wooster's reported comment that he would kill himself if he resumed drinking or using drugs. However, she concluded that this statement reflected a "belief system" that Wooster held, that the belief system was not a mental disease or defect, and that it could be altered through therapy. Dr. Sachsenmaier volunteered that there was a "legal argument" that Wooster did not meet "the threshold standard for being a danger to himself or others due to mental disease or defect." She did not support his petition for discharge but recommended, instead, that he be placed on conditional release after he received sex offender and chemical dependency treatment.

¶13 The District Court held a pre-trial conference in August, 1995. The District Court requested that Drs. Sachsenmaier and Stratford jointly prepare and propose a conditional release plan for Wooster. Doctors Stratford and Sachsenmaier presented the District Court

with a 5-year conditional release proposal in December, 1995. The District Court held a hearing in November, 1996.

¶14 In September, 1997, the District Court filed its findings of fact, conclusions of law and order regarding Wooster's petition for release. The District Court found that the mental disease or defect that Wooster had in 1978 and that resulted in his acquittal of deliberate homicide charges remained substantially unchanged and prevented his release from Montana State Hospital. The District Court determined that Wooster's mental disease or defect was an antisocial personality disorder and that Wooster continued to suffer from a chemical dependency and "untreated sexual offender tendencies." The District Court concluded that Wooster would pose an unreasonable threat to himself or others if released. Finally, the District Court concluded that many of the conditions proposed by Drs. Sachsenmaier and Stratford could not be monitored by the staff of Montana State Hospital and that the conditional release plan therefore could not adequately protect the public.

## Discussion

¶15 Wooster presents one issue for review: Did the District Court clearly err in finding that Wooster currently suffers from a mental disease or defect that causes him to be dangerous and bars his release?

¶16 Although Wooster has not challenged the constitutionality of his commitment, it is appropriate that we begin with an overview of several U.S. Supreme Court decisions that have recognized the circumstances under which a state may confine a defendant acquitted

8

of a crime by reason of his mental condition. In Jones v. United States (1983), 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694, the Court held that an insanity acquittee may be confined so long as he or she is both mentally ill and dangerous. In subsequent decisions, the Court has explored further the meaning of mentally ill and dangerous; however, *Jones'* two requirements of mental illness and dangerousness apply in the present case.

¶17 In Foucha v. Louisiana (1992), 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437, defendant Terry Foucha (Foucha) was found not guilty by reason of insanity of the illegal discharge of a firearm and aggravated burglary in 1984. Under the Louisiana statute then in effect, the state could confine a person if he was found dangerous; a companion finding of mental illness was not required. Foucha was committed to the East Feliciana Forensic Facility (Feliciana) "until such time as doctors recommend that he be released, and until further order of the court." *Foucha,* 504 U.S. at 74, 112 S.Ct. at 1782, 118 L.Ed.2d at 444. In 1988, the superintendent of Feliciana recommended that Foucha be released. A three-member panel assessed Foucha, reported that there was no evidence of mental illness, and recommended Foucha's conditional discharge. The trial judge appointed a sanity commission comprised of two doctors who had evaluated Foucha before his trial. The doctors concluded that Foucha was in remission from mental illness but stated they could not certify that he would not be a danger to himself or others if released. One of the doctors testified at a hearing that Foucha had probably suffered from a drug-induced psychosis, that he had recovered from that temporary condition, that he was "in good shape" mentally, and that he

9

had "an antisocial personality, a condition that is not a mental disease and that is untreatable." *Foucha*, 504 U.S. at 75, 112 S.Ct. at 1782, 118 L.Ed.2d at 445. The trial court ruled that Foucha was dangerous to himself and others and returned him to Feliciana.

¶18 However, the Court in *Foucha* concluded that a committed acquittee is "entitled to release when he has recovered his sanity or is no longer dangerous." *Foucha*, 504 U.S. at 77, 112 S.Ct. at 1784, 118 L.Ed.2d at 446 (citation omitted). Because the State did not contend that Foucha was mentally ill at the time of the hearing, the Court concluded that "keeping Foucha against his will in a mental institution is improper absent a determination in civil commitment proceedings of current mental illness and dangerousness." *Foucha*, 504 U.S. at 78, 112 S.Ct. at 1784, 118 L.Ed.2d at 447. The Court in *Foucha* recognized that Foucha had a liberty interest in being free from indefinite confinement in a mental facility. *Foucha*, 504 U.S. at 82, 112 S.Ct. at 1786, 118 L.Ed.2d at 449.

¶19 In Kansas v. Hendricks (1997), 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501, the Court made clear that no particular language is necessary to find that a defendant has a mental condition that, together with his dangerousness, justifies his confinement. In 1994, Kansas passed the Sexually Violent Predator Act (the Predator Act) which "establishes procedures for the civil commitment of persons who, due to a 'mental abnormality' or a 'personality disorder,' are likely to engage in 'predatory acts of sexual violence.' " *Hendricks*, 521 U.S. at 350, 117 S.Ct. at 2076, 138 L.Ed.2d at 505. Pursuant to the Predator Act, the State committed Leroy Hendricks (Hendricks), an inmate with a history of sexually

10

molesting children, who was due to be released soon after the Predator Act was enacted. The *Kansas Supreme Court* struck the *Predator Act*, holding that "its pre-commitment condition of a 'mental abnormality' did not satisfy . . . [the] 'substantive' due process requirement that involuntary civil commitment must be predicated on a finding of 'mental illness.' " *Hendricks*, 521 U.S. at 350, 117 S.Ct. at 2076, 138 L.Ed.2d at 508.

¶20 However, the *Hendricks* Court concluded that the Predator Act's definition of "mental abnormality" did meet substantive due process requirements. *Hendricks*, 521 U.S. at 356, 117 S.Ct. at 2079, 138 L.Ed.2d at 511. The Court observed that it had upheld civil commitment statutes when "they have coupled proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.' " *Hendricks*, 521 U.S. at 358, 117 S.Ct. at 2080, 138 L.Ed.2d at 512-13. The *Hendricks* Court noted that "we have never required State legislatures to adopt any particular nomenclature in drafting civil commitment statutes." *Hendricks*, 521 U.S. at 359, 117 S.Ct. at 2081, 138 L.Ed.2d at 513.

¶21 Wooster contends that the "threshold" issue is whether he "currently suffers from the mental disease or defect that resulted in his [original] commitment." Wooster argues that the District Court and several mental health professionals have concluded that he has an antisocial personality disorder but that § 46-14-101, MCA, specifically excludes antisocial personality disorder from consideration as a mental disease or defect. Wooster contends that without a diagnosis of mental illness or disorder, the Court is required by statute and by the Court's decision in *Foucha* to grant him a conditional release. Thus, Wooster argues that

11

the State has failed to prove that Wooster is mentally ill and that the District Court erred in finding that he has a mental disease or defect that causes him to be dangerous and thus concluding that he must remain confined.

¶22 Wooster relies primarily on the Court's decision in *Foucha* in arguing why he should be released. Wooster argues that he was originally committed, in 1978, because of a drug-induced psychosis but that after years of successful treatment he no longer has a serious mental disease or defect: he is presently diagnosed with antisocial personality disorder. Wooster asserts that the facts of his case are similar to Foucha's because "[o]riginally Foucha and Wooster were both acquitted because they were diagnosed as suffering from the same serious mental disease or defect, specifically drug-induced psychosis." Wooster argues that like the defendant in *Foucha*, he too is not mentally ill.

¶23 We determine, however, that the record does not support Wooster's argument that the facts in his case parallel the facts in *Foucha*. Contrary to his position on appeal, Wooster maintained after the murders that he was not under the influence of drugs or alcohol at the time of the offenses. In addition, Dr. Scolatti concluded that Wooster's "blackout" of the events of the murder was not consistent with memory loss caused by alcohol consumption or psychosis. Only recently has Wooster changed his story to assert that he suffered from "drug-induced psychosis" when he killed his daughters. We also note that contrary to Wooster's suggestion, the Court in *Foucha* did not conclude that antisocial personality disorder is not a mental illness. As previously noted, the State in *Foucha* did not contend

12

that Foucha was mentally ill and the *Foucha* Court did not determine whether antisocial personality disorder was a mental illness.

¶24 Wooster also argues that his situation is distinguishable from that of the defendant in State v. Woods (1997), 285 Mont. 46, 945 P.2d 918. In *Woods*, defendant Paul Woods (Woods) was acquitted on the ground of mental disease or defect of the charge of felony sexual assault on children. Woods was diagnosed as having borderline mental retardation and "other sexual deviation." *Woods*, 285 Mont. at 48, 945 P.2d at 919. He was committed to Montana State Hospital. In 1994 Woods petitioned for discharge. Mental health experts agreed that Woods was not seriously mentally ill. In affirming the district court's order that Woods remain confined, this Court determined that "the fact that a mental condition is in remission does not preclude a finding that the person continues to suffer from the condition and is in need of further detention." *Woods*, 285 Mont. at 54, 945 P.2d at 923. Wooster characterizes the defendant in *Woods* as a sex offender and pedophile who had rejected treatment and had not changed since his commitment. Wooster argues however that unlike Woods, his condition has changed; he no longer has a mental disease or defect.

¶25 In addition, Wooster contends that the State has not met its burden of proving that he is dangerous. Wooster argues that his mental evaluations show that he only poses a risk of future offenses if other events, including substance abuse, also occur and that he is not an immediate present danger, as required under Montana law.

13

¶26     The State's position may be summarized as follows. Wooster has an antisocial personality disorder that, coupled with his chemical dependency and untreated sex offender "tendencies," is a mental disease or defect. *Foucha* should be distinguished because in *Foucha* there was no controversy regarding the mental health of the defendant. Moreover, the Court's decision in *Hendricks* established that substantive due process does not require specific nomenclature to describe a person's mental condition. Thus, the District Court need not have invoked any particular words in finding that Wooster had a mental disease or defect as a result of which he is a danger to himself or to others. Drawing on *Woods*, the State argues that a mental illness in remission can constitute a mental illness for determining whether to continue confinement of an acquittee. Thus, while Wooster's chemical dependency may be in remission, he nonetheless has a mental disease or defect that includes chemical dependency. Finally, the State argues that Wooster's evaluations show that he remains dangerous if released.

¶27     Before addressing whether the District Court erred in concluding that Wooster suffers from a mental disease or defect causing him to be dangerous, we consider two related issues that Wooster has raised. First, we agree with the State that Wooster's mental health evaluations show that he would be dangerous if released without supervision and further treatment. Moreover, Wooster has not challenged the District Court's finding that he could not be supervised adequately by Montana State Hospital. The District Court did not err in concluding that Wooster poses a continuing danger to himself and other persons.

14

¶28 Second, we reject Wooster's argument that the "threshold" issue is whether his mental disease or defect is the same mental disease or defect that he had when he was originally committed. Wooster apparently interprets § 46-14-302(6), MCA, to mean that in order to continue confinement of a person acquitted by reason of lack of mental state (an acquittee), the court must find that the acquittee has the same mental disease or defect that he had when originally committed. The Court in *Foucha* remarked that "Due Process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed." *Foucha*, 504 U.S. at 79, 112 S.Ct. at 1785, 118 L.Ed.2d at 447 (citing *Jones*, 463 U.S. at 368). This dicta in *Foucha*, however, does not inexorably lead to Wooster's interpretation of § 46-14-302(6), MCA. As the Court in *Jones* observed, "[t]he purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and society from his potential dangerousness." *Jones*, 463 U.S. at 368, 103 S.Ct. at 3051-52, 77 L.Ed.2d at 708. We do not understand *Jones* to require that when an acquittee is determined to be mentally ill and dangerous as a result of that mental illness, the acquittee must be released if his mental illness is not the same mental illness as that from which he suffered at the time of his original commitment.

¶29 We note moreover that Wooster's apparent interpretation of § 46-14-302(6), MCA, would require difficult and confusing comparisons between the original and present mental conditions of an acquittee. We are not persuaded that such comparisons are necessary nor that they are feasible. As the *Jones* Court remarked:

15

> We have recognized repeatedly the "'uncertainty of diagnosis in this field and the tentativeness of professional judgment. The only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment."

*Jones*, 463 U.S. at 365, 103 S.Ct. at 3050, 77 L.Ed.2d at 705, n.13 (citations omitted).

¶30 We conclude that under § 46-14-302(6), MCA, in determining whether an acquittee "no longer suffers from a mental disease or defect," the appropriate inquiry is whether the acquittee suffers from a present mental disease or defect "that causes the person to present a substantial risk." Section 46-14-302(6), MCA. *Compare Foucha*, 504 U.S. at 78, 112 S.Ct. at 1784, 118 L.Ed.2d at 447 (concluding that "keeping Foucha against his will in a mental institution is improper absent a determination in civil commitment proceedings of *current mental illness and dangerousness*") (emphasis added); *Woods*, 285 Mont. at 53, 945 P.2d at 922 (concluding "the question under § 46-14-302, MCA, is . . . [simply] whether he suffers from a mental disease or defect that causes him to present a substantial risk"). Consistent with the requirements of *Foucha*, the procedures for continued confinement of an acquittee set forth in §§ 46-14-301 *et seq.*, MCA, are civil proceedings that require the State to prove by clear and convincing evidence that an acquittee has a mental disease or defect that causes him or her to be dangerous. *See* § 46-14-302(6)(b), MCA.

¶31 In determining whether the District Court erred in finding that Wooster had a mental disease or defect, we review Montana's procedures for the commitment of an acquittee. Section 46-14-301, MCA, provides in pertinent part:

16

**Commitment upon finding of not guilty by reason of lack of mental state --hearing to determine release or discharge**. (1) When a defendant is found not guilty for the reason that due to a mental disease or defect the defendant could not have a particular state of mind that is an essential element of the offense charged, the court shall order a predisposition investigation. . . .

. . . .

(5) A professional person shall review the status of the person each year. At the time of the annual review, the director of the department of public health and human services [the director] or the person or the representative of the person may petition for discharge or release of the person.

Section 46-14-301, MCA. Section 46-14-101, MCA, provides that "the term 'mental disease or defect' does not include an abnormality manifested only by repeated criminal or other antisocial behavior." Section 46-14-101, MCA.

¶32 Section 46-14-302, MCA, provides for the discharge or release of acquittees. The director may apply for the discharge or release of an acquittee in a report to a court. *See* § 46-14-302(1), MCA. The court "shall then appoint at least one person who is either a qualified psychiatrist or licensed clinical psychologist to examine the person and to report as to the person's mental condition." Section 46-14-302 (3), MCA. Moreover,

> If the court is satisfied by the report filed under subsection (1) and the testimony of the reporting psychiatrist or licensed clinical psychologist that the committed person may be discharged or released on condition because *the person no longer suffers from a mental disease or defect that causes the person to present . . . a substantial risk of an imminent threat of physical injury to the person or others*, or a substantial risk of substantial property damage, the court shall order the person's discharge.

Section 46-14-302 (5), MCA (emphasis added). If the court is not satisfied, it shall order a hearing to determine whether the acquittee may be safely released or discharged. *See* § 46-14-302(6), MCA. Such hearings are civil proceedings. *See* § 46-14-302(6)(b), MCA.

17

¶33 Thus, having affirmed the District Court's conclusion that Wooster is dangerous, the central issue is whether the District Court erred in finding that Wooster had a mental disease or defect that "causes the person to present a substantial risk of an imminent threat of physical injury to the person or others." Section 46-14-302(5), MCA. A determination of whether the District Court erred in finding that Wooster had such a mental disease or defect requires interpretation of § 46-14-101, MCA. Section 46-14-101, MCA, does not purport to define the term mental disease or defect; rather it simply excludes "repeated criminal or other antisocial behavior." The Montana statute was adopted from the Model Penal Code drafted by the American Law Institute (ALI).

¶34 Like the Montana Code, the Model Penal Code does not define "mental disease or defect," but simply declares that mental disease or defect "does not include an abnormality manifested only by repeated criminal or otherwise antisocial behavior."[1] Model Penal Code § 4.01 at 163. The ALI explained that "[a]part from this qualification, the Code pursues the only course that was deemed feasible. It treats the question of disease as one of fact, to be determined by the court or jury on the evidence presented in the cases that arise. As medical understanding may develop in such areas, for example, as brain chemistry, it can thus have its proper impact on the application of the law." Model Penal Code § 4.01 at 174-75.

---

[1] The Montana legislature indicated that it did not move § 46-14-101, MCA, to the definition section because "[w]hile this statute [§ 46-14-101] appears to be a definition of 'mental disease or defect,' it is actually an exclusion." *See* Commission Comments, 46-14-101, MCA.

18

¶35 Although the determination of mental disease or defect is one of fact, the absence of an affirmative definition of mental disease or defect, in § 46-14-101, MCA, invites confusion. In the present case, Drs. Stratford and Sachsenmaier agreed that there was *something* about Wooster's mental condition that required professional attention. They further agreed that because of that mental condition, Wooster was a substantial risk to himself or others if he did not receive treatment. However, they disagreed whether his mental condition was a mental disease or defect under Montana law. Working within a statutory void, the District Court attempted to describe Wooster's mental disease or defect in light of the language employed in the mental health evaluations of Wooster's mental condition. Although Drs. Stratford and Sachsenmaier agreed that Wooster has an antisocial personality disorder, they disagreed whether antisocial personality disorder was limited to abnormalities "manifested only by repeated criminal or other antisocial behavior." Section 46-14-101, MCA. As a consequence, the District Court's conclusion of mental disease or defect embodied the ambiguities in the definition of the antisocial personality disorder that was attributed to Wooster.

¶36 We note that a district court's definition of mental disease or defect need not be identical with medical definitions of mental disease or defect. As the Court in *Hendricks* remarked,

> Not only do "psychiatrists disagree widely and frequently on what constitutes mental illness," but the Court itself has used a variety of expressions to describe the mental condition of those properly subject to civil confinement. . . . Legal definitions, however, which must "take into account such issues as

19

individual responsibility . . . and competency," need not mirror those advanced by the medical profession.

*Hendricks*, 521 U.S. at 359, 117 S.Ct. at 2080-81, 138 L.Ed.2d at 513-14.

¶37 Moreover, we are not persuaded that the exclusion, in § 46-14-101, MCA, of "an abnormality manifested only by repeated criminal or other antisocial behavior" extends to antisocial personality disorder. Dr. Sachsenmaier assumed that in enacting § 46-14-101, MCA, the legislature meant to exclude not only abnormalities characterized only by criminal conduct but antisocial personality disorder itself. However, the American Psychiatric Association has remarked:

> Antisocial Personality Disorder must be distinguished from criminal behavior undertaken for gain that is not accompanied by the personality features characteristic of this disorder. **Adult Antisocial Behavior** . . . can be used to describe criminal, aggressive, or other antisocial behavior that comes to clinical attention but that does not meet the full criteria for Antisocial Personality Disorder. *Only when antisocial personality traits are inflexible, maladaptive, and persistent and cause significant functional impairment or subjective distress do they constitute Antisocial Personality Disorder.*

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, fourth edition, 649 (1994) (italics added). Thus, we conclude that a person with antisocial personality disorder has a condition that is manifest by much more than "only . . . repeated criminal or other antisocial behavior" and that this condition is not excluded by § 46-14-101, MCA. Section 46-14-101, MCA.

¶38 In determining whether to release or to continue the confinement of an acquittee, a district court must consider the mental condition of an acquittee but also make the

20

independent determination whether an acquittee has a mental disease or defect. However, when the District Court concluded that Wooster had the mental disease or defect of antisocial personality disorder, the District Court conflated the *medical finding* of antisocial personality disorder with the *legal conclusion* of mental disease or defect. The lack of an affirmative definition of mental disease or defect in § 46-14-101, MCA, clearly invited such confusion. Accordingly, we determine that §§ 46-14-301 *et seq.*, MCA, are unworkable without an affirmative definition of mental disease or defect.

¶39 We conclude that mental disease or defect, as set forth under § 46-14-101, MCA, requires an affirmative definition even as we recognize that § 1-2-101, MCA, provides that "the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. In construing § 1-2-101, MCA, this Court has determined that "[w]here the language is clear and unambiguous, no further interpretation is required." State ex rel. Keyes v. 13th Jud. Dist. Ct., 1998 MT 34, ¶ 15, 288 Mont. 27, ¶ 15, 955 P.2d 639, ¶ 15. However, we conclude that "mental disease or defect" is ambiguous.

¶40 We therefore consider the intent of the legislature. *See* § 1-2-102, MCA, providing that "the intention of the legislature is to be pursued if possible." The clear intent of the legislature is that courts interpret the term "mental disease or defect." *See* § 46-14-302(5), MCA, providing that "*[i]f the court is satisfied* by the report . . . that the committed person may be discharged or released on condition because the person no longer suffers from a

21

mental disease or defect" (emphasis added). The plain meaning of this statutory language is that courts shall determine whether an acquittee has a mental disease or defect. To make that determination, courts must interpret mental disease or defect. Thus, in concluding that an affirmative definition of § 46-14-101, MCA, is appropriate, this Court does not legislate but fills a statutory void that the legislature has clearly intended that Montana's courts address.

¶41    Although many states, like Montana, offer no affirmative definition of mental disease or defect, a number of states have such affirmative statutory definitions. *See, e.g.,* FLA. STAT. ANN. § 916.106(11) (West 1999) ("an impairment . . . [that] substantially interferes with a defendant's ability to meet the ordinary demands of living"); GA. CODE ANN. § 27-1503(2) (1998) (Harrison 1998) ("mentally ill" means a "disorder of thought or mood which significantly impairs . . . ability to cope with the ordinary demands of life"); IND. CODE ANN. § 35-41-3-6 (Lexis 1998) (defining mental disease or defect as "a severely abnormal mental condition that grossly and demonstrably impairs a person's perception"). Under New York's statutes, to retain a committed defendant, the State must establish that a defendant has a dangerous mental disorder or that he or she is mentally ill. *See* N.Y. CRIMINAL PROCEDURE LAW § 330.20 (McKinney 1994). Section 330.20(1)(c) states that " 'Dangerous mental disorder' means: (i) that a defendant currently suffers from a 'mental illness' as that term is defined in subdivision twenty of section 1.03 of the mental hygiene law and (ii) that because of such condition he currently constitutes a physical danger to himself

22

or others." N.Y. CRIMINAL PROCEDURE LAW § 330.20(1)(c) (McKinney 1994).

Section 1.03(20) provides:

> "Mental illness" means an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation.

N.Y. MENTAL HYGIENE LAW § 1.03(20) (McKinney 1996).

¶42 Among the affirmative definitions of mental disease, defect or illness that states have enacted, we favor that adopted by New York. The New York statute carefully eschews ambiguous mental health terms in favor of a clear workable legal definition. We conclude that an affirmative definition of mental disease or defect complements the intent of Montana's legislature. An affirmative definition of mental disease or defect will enable district courts to reliably and appropriately distinguish the legal conclusion of mental disease or defect from the often confusing and inconsistent medical findings that concern an acquittee's mental condition. We therefore modify and adopt New York's affirmative definition of mental illness. *See* N.Y. MENTAL HYGIENE LAW § 1.03(20) (McKinney 1996).

¶43 We hold that mental disease or defect, as set forth under § 46-14-101, MCA, means an affliction with a mental disease or mental condition that is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment, and rehabilitation. We further hold that this affirmative definition of mental disease or defect complements but does not alter the exclusion, in § 46-

23

14-101, MCA, of "an abnormality manifested only by repeated criminal or other antisocial behavior."

¶44     We remand this case for further proceedings in which the parties through their experts and the District Court will revisit the issue whether Wooster has a mental disease or defect as we have defined it herein.

_/s/ W. William Leaphart_
Justice

We concur:

_/s/ J.A. Turnage_
Chief Justice

_/s/ Karla M. Gray_

_/s/ William E. Hunt_

_/s/ Jim Regnier_

_/s/_

_/s/_
Justices

February 18, 1999

### CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

BRAD L BELKE
ATTORNEY AT LAW
PO BOX 4079
BUTTE MT 59702-4079

HON JOSEPH P MAZUREK
ATTORNEY GENERAL
215 N SANDERS
HELENA MT 59620

ROBERT MCCARTHY COUNTY ATTORNEY
BRAD NEWMAN CHIEF DEPUTY
155 WEST GRANITE
BUTTE MT 59701

ED SMITH
CLERK OF THE SUPREME COURT

STATE OF MONTANA

BY: _D. Geeagher_
Deputy