JUSTICE RICE,
dissenting.
¶96 The prohibition against homicide-intentionally causing the death of another-protects and preserves human life, is the ultimate recognition of human dignity, and is a foundation for modern society, as it has been for millennia past. Based upon this foundation, Anglo-American law, encompassing the law of Montana, has prohibited the enabling of suicide for over 700 years. Wash. v. Glucksberg, 521 U.S. 702, 711, 117 S. Ct. 2258, 2263 (1997) (citations omitted). However, in contradiction to these fundamental principles, the Court concludes that physician-assisted suicide does not violate Montana’s public policy. In doing so, the Court has badly misinterpreted our public policy: assisting suicide has been explicitly and expressly prohibited by Montana law for the past 114 years. More than merely setting aside the District Court’s order herein, I would reverse the judgment entirely.
¶97 A flaw that underlies the Court’s analysis is its failure to *270 distinguish between the physician’s basic intention in the assisted-suicide case from the physician’s intention while rendering treatment in other cases. As developed further herein, the intentions in these two cases are diametrically opposed, and create the very difference between a criminal and noncriminal act. Physician-assisted suicide occurs when a physician provides a lethal drug with the intent to cause, when the drug is taken by the patient, the patient’s death. With palliative care, the physician does not intend his or her actions to cause the patient’s death, but rather intends to relieve the patient’s pain and suffering. For this reason a physician providing palliative care, even in cases where the treatment arguably contributes to the patient’s death, lacks the requisite mental state to be charged under homicide statutes. Kan. v. Naramore, 965 P.2d 211, 214 (Kan. App. 1998) (quoting Gordon & Singer, Decisions and Care at the End of Life, 346 Lancet 163, 165 (July 15,1995)); see also §§ 45-5-102, -103, -104, MCA (2007). A similar distinction arises in the withholding or withdrawal of medical treatment that merely prolongs the dying process, pursuant to the Montana Rights of the Terminally 111 Act. Under the Act, a patient may refuse treatment and allow death to occur naturally, and physicians incur no liability, having not administered any death-causing treatment. Sections 50-9-103, -204, MCA.
¶98 Criminal acts may be defended on the basis of a victim’s consent to the act in certain circumstances. Section 45-2-211(1), MCA. However, this statute makes consent “ineffective” if “it is against public policy to permit the conduct or the resulting harm.” Section 45-2-211(2), MCA. The Court concludes from its review of Montana law that “it would be incongruous to conclude that a physician’s indirect aid in dying is contrary to public policy.” Opinion, ¶ 38. Because, generally, “the public policy of the State of Montana is set by the Montana Legislature through its enactment of statutes” Duck Inn, Inc. v. Mont. State University-Northern, 285 Mont. 519, 523-24, 949 P.2d 1179, 1182 (1997) (citations omitted), I turn to the very statutes which address the assisting of suicide.
The Statutory Prohibition on the Aiding or Soliciting of Suicide

‘If the conduct of the offender made him the agent of the death, the offense is criminal homicide notwithstanding the consent or even the solicitations of the victim.”

~ Commission Comments, § 45-5-105, MCA.
¶99 Montana originally enacted a prohibition on the aiding or soliciting of suicide statute in 1895, providing that “[e]very person who *271 deliberately aids, or advises or encourages another to commit suicide is guilty of a felony.” Section 698, Mont. Penal Code (1895). The prohibition on aiding suicide has been the formally enacted public policy of our state for the succeeding 114 years. Under the 1895 enactment, the death or survival of the victim was irrelevant, as the crime only required that a defendant deliberately aid, advise, or encourage another to commit suicide. The Legislature left the statute untouched for over seventy years.
¶100 In 1973, the Legislature revised the statute to read:
(1) A person who purposely aids or solicits another to commit suicide, but such suicide does not occur commits the offense of aiding or soliciting suicide.
(2) A person convicted of the offense of aiding or soliciting a suicide shall be imprisoned in the state prison for any term not to exceed ten (10) years.
Section 94-5-106, RCM (1973). The Legislature codified this provision within the homicide statutes. The current version of the statute is the same as the 1973 version, except that the Legislature has increased the potential punishment for the crime by authorizing a $50,000 penalty. Section 45-5-105(2), MCA (2007).
¶101 Under the wording of the current version of the statute, a person may be prosecuted for aiding or soliciting another to commit suicide only if the victim survives. The purpose of this change of the statutory language from the pre-1973 version was explained by the Criminal Code Commission that proposed it. When the victim dies, the act is to be prosecuted as a homicide. “If the conduct of the offender made him the agent of the death, the offense is criminal homicide ...” Commission Comments, § 45-5-105, MCA (emphasis added). The Commission Comments then direct attention to the other crimes codified within the same homicide section-deliberate homicide, mitigated deliberate homicide, and negligent homicide. Commission Comments, § 45-5-105, MCA (citing §§ 45-5-102, -103, -104, MCA). Like the other homicide statutes, the statute prohibiting the aiding or soliciting of suicide makes the offense a felony. Sections 45-5-102(2), -103(4), -104(3), -105(2), MCA. The justification for the felony designation of the offense, despite the fact the victim has survived, was provided by the Commission: “The rationale behind the felony sentence for the substantive offense of aiding or soliciting suicide is that the act typifies a very low regard for human life.” Commission Comments, § 45-5-105, MCA (emphasis added). This clear statement of the State’s policy to protect human life is steadfastly avoided by the Court in its *272 analysis.
¶102 Thus, under Montana law, physicians who assist in a suicide are subject to criminal prosecution irrespective of whether the patient survives or dies. If the patient survives, the physician may be prosecuted under aiding or soliciting suicide. Section 45-5-105, MCA. If the patient dies, the physician may be prosecuted under the homicide statutes. Commission Comments, § 45-5-105, MCA (citing §§ 45-5-102, -103, -104, MCA).
¶103 Importantly, it is also very clear that a patient’s consent to the physician’s efforts is of no consequence whatsoever under these statutes. The Commission Comments explain that a physician acting as the agency of death may not raise “consent or even the solicitations of the victim” as a defense to criminal culpability. Commission Comments, § 45-5-105, MCA (emphasis added). This principle has likewise been stated and restated by courts around the country: Mich, v. Kevorkian, 639 N.W.2d 291, 331 (Mich. App. 2001) (“consent and euthanasia are not recognized defenses to murder”); Gentry v. Ind., 625 N.E.2d 1268, 1273 (Ind. App. 1st Dist. 1993) (“consent is not a defense to conduct causing another human being’s death”) (citation omitted); Pa. v. Root, 156 A.2d 895, 900 (Pa. Super. 1959) (“The Commonwealth is interested in protecting its citizens against acts which endanger their lives. The policy of the law is to protect human life, even the life of a person who wishes to destroy his own. To prove that the victim wanted to die would be no defense to murder.” (Emphasis added.)), overruled on other grounds, Pa. v. Root, 170 A.2d 310 (Pa. 1961).
¶104 The Court offers curious reasons for rejecting these clear and express statements of the State’s public policy. Opinion, ¶ 39-42. It criticizes the citation to the Criminal Law Commission’s Comments about the intent and the structure of the homicide statutes, despite the fact the Court has repeatedly used the Commission Comments in the application of our statutes. See e.g. State v. Wooster, 1999 MT 22, ¶ 34 n. 1, 293 Mont. 195, 974 P.2d 640; State v. Hawk, 285 Mont. 183,187, 948 P.2d 209, 211 (1997); State v. Shively, 2009 MT 252, ¶ 17, 351 Mont. 513, 216 P.3d 732; State v. Price, 2002 MT 229, ¶ 18, 311 Mont. 439, 57 P.3d 42; State v. Meeks, 2008 MT 40, ¶ 9, 341 Mont. 341, 176 P.3d 1073. The Comments are critical here because they provide the intent behind and the interrelation among the homicide statutes-how they are designed to work together and the inapplicability of the defense of consent-and thus answer the specific question before the Court, an answer not made clear from the wording of the statutes themselves. The reader should find it astonishing that, in this case *273 only, involving an issue of life and death, the Court refuses to consider the Comments which stand in direct contradiction to its decision. Dispensing with the Comments allows the Court to construct an artificial artifice between the aiding suicide statute and the other statutes in the homicide section of the Criminal Code, when the clear intent was just the opposite-that there was to be no artifice.[1]
¶105 The Court then criticizes this Dissent as offering circular reasoning. Opinion, ¶ 43. The Court believes the Dissent is arguing that the consent statute is inapplicable merely because the conduct of physician-assisted suicide is defined as an offense and that such reasoning would obviate the consent statute for all offenses. However, the Court has misstated the Dissent. The consent statute is inapplicable, not simply because physician-assisted suicide is defined as illegal conduct, but because the intent of the Legislature was that the consent defense would not apply to this particular crime. Again, “[i]f the conduct of the offender made him the agent of the death, the offense is criminal homicide notwithstanding the consent or even the solicitations of the victim.” Commission Comments, § 45-5-105, MCA. Application of the consent statute to other crimes is not affected by the Legislature’s elimination of the consent defense for this particular crime. If this is circular or illogical, then the blame rests with the Legislature, because the only reasoning here offered by the Dissent is to point out the plain explanation of the working of the statutes. The Dissent has added nothing more. It is the Court who offers many words in an effort to reason away from this plain language and clear intent, when it is not our duty to agree or disagree with the Legislature’s determination. “[T]his Court may not concern itself with the wisdom of such statutes” by arguing the Montana Legislature’s logic is somehow circular or otherwise inappropriate. Duck Inn, Inc., 285 Mont. at 523-24, 949 P.2d at 1182. The Court’s role is simply to find the public policy. The homicide statutory framework and the prohibition against consent, by itself, is more than enough to foreclose any suggestion that Montana even remotely favors or supports *274 physician-assisted suicide.[2] However, there is further evidence.
The Montana Rights of the Terminally 111 Act
¶106 In 1991, the Legislature enacted the Montana Rights of the Terminally III Act (Montana Act) by substantially adopting the Uniform Rights of the Terminally 111 Act (Uniform Act). Secs. 1-16, Ch. 391, L. 1991 (codified at §§ 50-9-101 to -206, MCA). The Prefatory Note in the Uniform Act explains that “[t]he scope of the Act is narrow. Its impact is limited to treatment that is merely life-prolonging ,...”[3] Uniform Rights of Terminally 111 Act (1989), 9C U.L.A. 311, 312 (2001) (emphasis added). The form Declaration provided by the Montana Act for patients, by its plain language, further supports the scope of the purposes articulated in the Uniform Act:
If I should have an incurable or irreversible condition that, without the administration of life-sustaining treatment, will, in the opinion of my attending physician or attending advanced practice registered nurse, cause my death within a relatively short time and I am no longer able to make decisions regarding my medical treatment, I direct my attending physician or attending advance practice registered nurse, pursuant to the Montana Rights of the Terminally 111 Act, to withhold or withdraw treatment that only prolongs the process of dying and is not necessary to my comfort or to alleviate pain.
Section 50-9-103(2), MCA (emphasis added). And, as the Court acknowledges, the Montana Act is careful to explain that it “does not condone, authorize, or approve mercy killing or euthanasia.” Section 50-9-205(7), MCA.
*275 ¶107 The operative words in the Montana Act are those permitting a patient to “withhold” and “withdraw” life-sustaining treatment. See §§ 50-9-103(2), -106, -204, -205, MCA. Largely self-evident, to “withhold” means “to desist or refrain from granting, giving, or allowing.” Webster’s Third New International Dictionary of the English Language 2627 (Philip Babcock Gove ed., G. & C. Merriam Co. 1971). Similarly, “withdraw” is defined as “to take back or away (something bestowed or possessed).” Webster’s Third New International Dictionary of the English Language at 2626. Neither word incorporates the concept of affirmatively issuing a life-ending drug to a patient. Rather, the plain language permits only the taking away of, or refraining from giving, certain medical treatment-that which merely prolongs the dying process. Sections 50-9-102(9), -103(2), -106, -204, -205, MCA.
¶108 Although the Court reasons that because the Montana Act permits the withholding or withdrawal of treatment prolonging the dying process, “it would be incongruous to conclude that a physician’s indirect aid in dying is contrary to public policy,” the opposite is true: it is incongruous to conclude there is no legal distinction between the withdrawal of life-prolonging medical treatment and the provision of life-ending treatment. This distinction is clearly recognized by the wording of our statutes, discussed above, and by the courts. See e.g. Vacco v. Quill, 521 U.S. 793, 800, 808, 117 S. Ct. 2293, 2297-98, 2302 (1997) (distinguishing between physician-assisted suicide and refusal of medical treatment does not violate equal protection); and compare Glucksberg, 521 U.S. at 705-06, 117 S. Ct. at 2261 (holding there is no constitutional right to physician-assisted suicide) with Cruzan v. Mo. Dept. of Health, 497 U.S. 261, 277-79, 110 S. Ct. 2841, 2851-52 (1990) (assuming a constitutional right for competent person to refuse unwanted medical treatment).
¶109 To further illustrate the Legislature’s policy preference in respecting a person’s right to refuse medical treatment, Montana allows a person to forego cardiopulmonary resuscitation (CPR). Sections 50-10-101 to -107, MCA. To the extent a patient refuses the receipt of CPR, physicians must either refrain from conducting CPR or transfer the patient into the care of a physician who will follow the do not resuscitate protocol. Section 50-10-103(2), MCA. As with the Rights of the Terminally 111 Act, a person may refuse treatment, but the tenor of the statute provides no support for physicians shifting from idle onlookers of natural death to active participants in their patients’ suicides.
¶110 Thus, the law accommodating a patient’s desire to die of *276 natural causes by withholding treatment does not, as the Court posits, support a public policy in favor of the deliberate action by a physician to cause a patient’s pre-natural, or premature, death.

The 1972 Montana Constitution

fill Montana’s longstanding public policy against the assistance of suicide was continued by adoption of the 1972 Constitution. It supports neither the Court’s public policy determination, nor the District Court’s constitutionally based decision.
¶ 112 No statement concerning a “right to die” is included within the Constitution’s Declaration of Rights. This absence is neither accidental nor the product of ignorance. In this regard, it is important to note that “[n]o proposal was adopted or rejected without considered deliberation.” Montana Constitutional Convention, Bill of Rights Committee Proposal, February 22, 1972, p. 618.
¶113 One of the proposals receiving such careful deliberation was Proposal No. 103. Montana Constitutional Convention, Minutes of the Bill of Rights Committee, February 9,1972, p. 2. Submitted to the Bill of Rights Committee by Delegate Robert L. Kelleher, Proposal No. 103 would have included a right to die within the Constitution’s Declaration of Rights. Montana Constitutional Convention, Delegate Proposals, February 2, 1972, p. 223.
¶ 114 Delegate Kelleher’s proposal provided, in pertinent part, “The incurably ill have the right not to be kept alive by extraordinary means.” Montana Constitutional Convention, Delegate Proposals, February 2,1972, p. 223. Delegate Kelleher testified before the Bill of Rights Committee, “that the person with an incurable disease should have the right to choose his own death.” Montana Constitutional Convention, Minutes of the Bill of Rights Committee, February 12, 1972, p. 5. Alternatives offered to Kelleher’s proposal covered the broad spectrum of “right to die” scenarios. Joe Roberts testified on the same day as Delegate Kelleher, advocating for broader language: “There shall be a right to die. The legislature shall make appropriate provisions therefore.” Montana Constitutional Convention, Minutes of the Bill of Rights Committee, February 12, 1972, p. 6; Montana Constitutional Convention, Testimony of Joe Roberts Before the Bill of Rights Committee Concerning the Right to Die, February 12,1972, p. 4. Mr. Roberts referenced the “very poignant testimony” of witness Joyce Franks and her “personal encounter with the agonizing death of her father.” Montana Constitutional Convention, Testimony of Joe Roberts Before the Bill of Rights Committee Concerning the Right to Die, February 12,1972, p. 1. Ms. Franks’ testimony had described the *277 death of her 86-year-old father and his wish that a doctor “give him something to put him to sleep right then.” Montana Constitutional Convention, Testimony of Joyce M. Franks Before the Bill of Rights Committee, February 3, 1972, p. 5A. Ms. Franks stated to the Bill of Rights Committee, “What I am working for is that every person shall have the right to determine, barring accident, the manner of his dying. And then, I am advocating the twin right to make it legal, if he desires this type of death, for a person to receive a quick and easy medicated death somehow.” Montana Constitutional Convention, Testimony of Joyce M. Franks Before the Bill of Rights Committee, February 3, 1972, p. 1. Ms. Franks therefore urged adoption of an amendment stating: “Every citizen shall be allowed to choose the manner in which he dies.” Montana Constitutional Convention, Testimony of Joyce M. Franks Before the Bill of Rights Committee, February 3,1972, p. 2; see also Charles S. Johnson, Right to Die Resurfaces in Montana, Independent Record FI (Aug. 23, 2009) (describing Constitutional Convention’s consideration and rejection of a right to die).
¶115 However, the Bill of Rights Committee rejected Kelleher’s proposal in its entirety and also rejected all of the alternatives which had been offered in conjunction with Kelleher’s proposal to incorporate a “right to die” of any kind within the new Constitution. See Montana Constitutional Convention, Minutes of the Bill of Rights Committee, February 9, 1972, p. 2.
¶116 Nor were other provisions of the Constitution, such as the Individual Dignity and the Right of Privacy provisions, drafted to include a right to die. The Constitutional Convention adopted the Individual Dignity Section for the express purpose of providing equal protection and prohibiting discrimination. The Bill of Rights Committee proposed the Individual Dignity Section “with the intent of providing a Constitutional impetus for the eradication of public and private discriminations based on race, color, sex, culture, social origin or condition, or political or religious ideas.” Montana Constitutional Convention, Bill of Rights Committee Proposal, February 22,1972, p. 628 (emphasis added). During the floor debate on the provision, Delegate Otto Habedank expressed concern that he would be required “to associate with people that I choose not to associate with.” Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1643. Delegate Wade J. Dahood, Chairman of the Bill of Rights Committee, responded to Delegate Habedank’s concern by stating, “There is no intent within this particular section to do anything other than to remove the apparent type of discrimination that all of us object *278 to with respect to employment, to rental practices, to actual association in matters that are public or matters that tend to be somewhat quasi-public.” Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1643. Delegate Dahood’s statement was consistent with the expressed intent of the Bill of Rights Committee Proposal, which was, in consideration of the entirety of Article II, Section 4, to provide “a Constitutional impetus for the eradication of public and private discriminations ....” See Montana Constitutional Convention, Bill of Rights Committee Proposal, February 22,1972, p. 628; Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1643. Nothing within these discussions or explanations suggests even a thought that the dignity clause contained vague, lurking rights that might someday manifest themselves beyond what the delegates or the citizens of Montana who approved the Constitution believed, and overturn long-established law, here, the policy against assisted suicide. The reference to dignity therefore provides an aspirational introduction to the already well-established substantive legal principles providing the operative vehicles to achieve dignity: equal protection and the prohibition upon discrimination.[4] Likewise, the right to privacy did not alter the State’s policy against assisted suicide. There is nothing within either the language of the provision or the convention proceedings which would reflect any such intention. See e.g. Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, pp. 1680-82; Montana Constitutional Convention, Bill of Rights Committee Proposal, February 22, 1972, pp. 632-33. For such reasons, not one court of last resort has interpreted a constitutional right of privacy to include physician-assisted suicide. Kirscher v. McIver, 697 So. 2d 97, 100, 104 (Fla. 1997); Sampson v. Alaska, 31 P.3d 88, 98 *279 (Alaska 2001); Glucksberg, 521 U.S. at 705-06, 117 S. Ct. at 2261. No evidence exists that the delegates intended the right of privacy to change the state’s longstanding public policy. Since adoption of the 1972 Constitution, the Legislature has continued to enact legislation prohibiting assisted suicide. Indeed, the Legislature directed the Department of Public Health and Human Services to “implement a suicide prevention program by January 1,2008,” including a plan that must delineate “specific activities to reduce suicide.” Sections 53-21-1101(1), -1102(2)(b), MCA. This is further indication of a state public policy against assisted suicide.
¶117 Because we live in a democracy, this policy may someday change. Controlling their own destiny, Montanans may decide to change the State’s public policy after what would be, no doubt, a spirited public debate. In fact, efforts in that regard have already started. See e.g. Bill Draft LC1818, 61st Leg., Reg. Sess. (Jan. 9, 2008) (The proposed “Montana Death with Dignity Act” had the stated purpose of “allowing a terminally ill patient to request medication to end the patient’s life.”). This Court should allow the public debate to continue, and allow the citizens of this State to control their own destiny on the issue.
¶118 Until the public policy is changed by the democratic process, it should be recognized and enforced by the courts. It is a public policy which regards the aiding of suicide as typifying “a very low regard for human life,” Commission Comments, § 45-5-105, MCA, and which expressly prohibits it. Instead, the Court rejects the State’s longstanding policy. It ignores expressed intent, parses statutes, and churns reasons to avoid the clear policy of the State and reach an untenable conclusion: that it is against public policy for a physician to assist in a suicide if the patient happens to live after taking the medication; but that the very same act, with the very same intent, is not against public policy if the patient dies. In my view, the Court’s conclusion is without support, without clear reason, and without moral force.
¶119 I would reverse.
HON. HEGEL, District Court Judge, sitting in place of CHIEF JUSTICE McGRATH, joins in the dissenting Opinion of JUSTICE RICE.

 If further demonstration of the propriety of consulting the Commission Comments is desired, the District Court’s observations about the statute may be considered:
The Court: I thought “How strange,” but then I realized, thought later maybe it’s because if the person does die, they aren’t charged with assisted suicide, they’d be charged with a homicide.
Mr. Johnstone: That’s what my criminal Counsel, Ms. Anders, has told me.
The Court: But it was really strange when I first ran across that. I had to read it ten times to figure that one out.
Hrg. Transcr. 63:3-12 (Oct. 10, 2008) (emphasis added).

 The Court’s approach is also disconcerting when considering the ambiguity this Opinion will bring for those who are not physicians. Physician assistants, nurse-practitioners, nurses, friends, and family do not qualify as physicians, but they will all undoubtedly be involved to varying degrees in the process of physician-assisted suicide. Yet, the Court’s public policy reasoning is based upon the role of a physician. The net result of the decision, whether intended or not, is to leave “non-physicians” with the question of whether the decision premised upon a physician-based policy will apply to them as well.

 The quoted passage, in its entirety, is as follows:
The scope of the Act is narrow. Its impact is limited to treatment that is merely life-prolonging, and to patients whose terminal condition is incurable and irreversible, whose death will soon occur, and who are unable to participate in treatment decisions. Beyond its narrow scope, the Act is not intended to affect any existing rights and responsibilities of persons to make medical treatment decisions. The Act merely provides alternative ways in which a terminally-ill patient’s desires regarding the use of life-sustaining procedures can be legally implemented.
Uniform Rights of Terminally 111 Act (1989), 9C U.L.A. at 312.

 The historical origins of the dignity clause are enlightening. At the Constitutional Convention, delegates reviewed two foreign constitutions, the 1949 West Germany Constitution and the 1951 Puerto Rico Constitution. Montana Constitutional Convention Commission, Constitutional Convention Studies No. 10: Bill of Rights 242 (1972); Montana Constitutional Convention, Bill of Rights Committee Proposal, February 22, 1972, p. 628. The West German Constitution, the eldest of the two, provided, “The dignity of man shall be inviolable.” Montana Constitutional Convention Commission, Constitutional Convention Studies No. 10: Bill of Rights at 242 (citing West German Const, art. I). The Montana Constitution contains the identical provision, adopted word-for-word except for the use of the gender-neutral “human being” instead of “man.” The West German Constitution was developed in response to the Nazi regime’s unequal treatment, persecution, and ultimate killing of the Jewish people. See e.g. Gregory H. Fox & Georg Nolte, Intolerant Democracies, 36 Harv. Intl. L.J. 1, 32 (1995); George J. Annas, The Man on the Moon, Immortality, and other Millennial Myths: The Prospects and Perils of Human Genetic Engineering, 49 Emory L.J. 753, 758-59 (2000).